**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CIVIL ACTION NO. 06-30003-01** |
| **VERSUS** | * | **JUDGE JAMES** |
| **STEPHEN A. COLLINS** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress filed by the defendant, Stephen A. Collins ("Collins") (Document No. 28-1). For reasons stated below, it is recommended that the motion be **DENIED.**

## BACKGROUND

The evidence presented at a hearing held on Thursday, September 28, 2006, demonstrated as follows. At approximately 11:00 a.m. on the morning of January 11, 2006, Officer Dean Baugh ("Baugh") of the Monroe Police Department observed a blue Dodge Magnum traveling on the 1700 block of Orange Street in Monroe. Baugh testified that he was not looking for the car at the time, but that it caught his eye because he had received information from an informant that a narcotics dealer, known as Half-Dead, was known to drive a blue Dodge Magnum. Baugh proceeded to follow the vehicle for approximately one or two blocks in an attempt to determine if the driver was in fact Half Dead and whether there were any traffic violations being committed. However, during this two-block span, Baugh noticed that the vehicle had no visible license tags and, therefore, initiated a traffic stop. When the vehicle pulled over on the 1700 block of South Fifth, the driver exited the vehicle, at which time Baugh recognized the driver as Stephen

Collins.[1]  As Baugh approached the vehicle, he noticed that there was a temporary tag taped to the top right corner of the rear window; however, due to the dark tinting on the rear glass, the temporary tag was not visible unless one stood next to the rear bumper of the vehicle.

Baugh testified that Collins immediately wanted to know the reason for the stop, which Baugh provided.  According to Baugh, Collins was extremely nervous and agitated from the stop's inception.  Collins quickly stated that the car was a rental car and that he should not be held responsible for the rental company's mistake in not properly displaying the license tag. When Baugh first made contact with Collins, Baugh asked Collins where he had been and where he was going. Collins responded that he had left a friend's house and was going home to 206 Wilson Street.  Baugh then asked for Collins' driver's license and the car's rental papers, which Collins provided.  After instructing Collins to have a seat in his vehicle, Baugh initiated a computer check of Collins' driver's license, and contacted Enterprise Rental by phone because the return date on the rental papers showed that the vehicle was supposed to have been returned a week earlier.

Baugh then initiated a criminal records check of Collins.  Baugh was ultimately able to verify Collins' license, and the criminal background check showed that Collins had three previous narcotics arrests.  Regarding the rental car, an Enterprise Rental employee informed Baugh that the car was rented in the name of Timikia Moore, who is either Collins' wife or girlfriend, and that Collins was listed as an additional driver.  The employee also confirmed that

---

[1] Baugh testified that he immediately recognized Collins because he had seen him before on several occasions and had participated in another traffic stop involving Collins approximately three or four weeks prior to the stop in question.  Baugh also testified that he was aware of information received by the Monroe Police Department implicating Collins in past criminal conduct, including narcotics trafficking.

2

the car's return date was not until mid February. Baugh testified that the entire process of running the driver's license check, the criminal history, and verifying the rental information lasted approximately eight to ten minutes. However, according to Baugh, during the time that he was collecting this information, Collins exited his vehicle four or five times in an agitated manner, telling Baugh to either give him a ticket or let him go because he was in a hurry. Each of these times, Baugh or Officer Winborn, who had subsequently arrived at the stop, advised Collins to remain in the vehicle. Baugh testified that Collins' nervous behavior indicated that he wanted the traffic stop to end as soon as possible. Baugh also found it suspicious that Collins went from vehemently not wanting a ticket to wanting Baugh to just give him a ticket and let him go. Baugh testified that this, combined with Collins' nervous behavior and constant exiting of the vehicle, indicated to him there was some type of illegal activity that Collins was trying to conceal. He based this conclusion on his experience as a law enforcement officer, including experience gained from numerous traffic stops involving the discovery of illegal narcotics.

Baugh then testified that, after Collins exited his vehicle for the fifth time while Baugh was trying to verify his information and write him a ticket,[2] officer safety became an issue so that Baugh needed to address whatever was causing Collins not to obey his commands. In an attempt to determine why Collins was so nervous and agitated, Baugh again asked Collins where he was coming from and where he was going; this time, however, Collins stated that he had just left his house on Colonial Drive and was going to a friend's house, which was different from what he had previously said. Because this inconsistent statement heightened his suspicion even more, Baugh

---

[2]Baugh testified that he was not through examining Collins' criminal history at the point when Collins exited his vehicle the last time, and that he did not finish the criminal history check until after Collins was under arrest.

3

then began to question Collins regarding whether he had any guns, marijuana, or PCP on him or in the vehicle. Baugh testified that Collins's response to all these questions was "no" and that Collins maintained eye contact while answering. However, when Baugh asked Collins about crack cocaine, he looked back over his shoulder, up, and to the right and said "no," which was different from any other response Collins had given. According to Baugh's training and experience, this response showed deceptive behavior.

At this point, Baugh asked Collins if he could search him and the vehicle, to which Collins agreed. Collins continued to fidget and his hands were shaking, so Baugh asked him again for consent to search, which Collins granted. Baugh then noticed what he termed a "bulge" in Collins' front waistband, the placement of which indicated to Baugh that Collins was attempting to hide contraband or some type of weapon. After feeling the item, Baugh handcuffed Collins and advised him of his *Miranda* rights, but notified him that he was not under arrest. Baugh then asked Collins if he had any problem with his retrieving the item, to which Collins responded in the negative. The item was a plastic bag containing almost two ounces of crack cocaine. Baugh then placed Collins under arrest. He asked Collins if he had any more crack cocaine, which Collins denied, and then he again requested permission to search to vehicle, which Collins granted. After Collins was placed in the back of the patrol car, Baugh searched the vehicle and found four individual sandwich bags containing almost one ounce of crack cocaine per bag in what Baugh described as the sunglasses compartment in the middle rooftop of the vehicle. Baugh then wrote Collins a ticket for improper display of a license tag and gave it to a Metro Narcotics detective who had arrived on the scene. The same detective then transported Collins to Metro Narcotics headquarters, at which point Baugh's involvement in the case ended.

## LAW AND ANALYSIS

4

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The stop of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). The reasonableness of traffic stop searches and seizures under the Fourth Amendment is analyzed in accordance with the framework set forth by the Supreme Court in *Terry v. Ohio*. 392 U.S. 1 (1968). Under *Terry*, the analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993)(citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).

Regarding *Terry's* first prong, in *Whren v. United States*, the Supreme Court unanimously upheld a traffic stop in which an officer observed a defendant commit a traffic violation. 517 U.S. 806 (1996). In accordance with its long line of cases, the Supreme Court held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. The Court also flatly rejected an invitation by the defendant to look to the subjective motivation of the police officer at the time of the stop.

Pursuant to *Terry* and *Whren*, stopping a vehicle for a traffic violation is justified so long as probable cause exists. *See Whren*, 517 U.S. at 810; *Terry*, 392 U.S. at 19-20. Although Collins characterizes the stop as based on the lack of a license tag, Baugh testified that he was unable to see a license tag on the vehicle and therefore stopped Collins for improper display of a license tag, which is clearly a traffic violation. Furthermore, the fact that this was a rental car is of no consequence to the propriety of the initial stop since Baugh had no way of acquiring such

5

information prior to the stop, and a driver of a non-owned vehicle is still subject to being stopped and ticketed for violations involving that vehicle. Collins has provided no controverting evidence to refute the fact that the license tag was not properly displayed; therefore, Baugh had sufficient probable cause and was wholly justified in stopping the vehicle.[3]

Under the second prong of the *Terry* inquiry, the question before this Court is whether Baugh's actions after he legitimately stopped Collins were ". . . reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Id.* at 507. This is because "a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507 (citations omitted). "Like other circuits, . . . [the Fifth Circuit] . . . has found no constitutional impediment to a law enforcement officer's request[ing] to examine a driver's license and vehicle registration or rental papers during a traffic stop or to his running a computer check on both." *Id.* at 508; *see also United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002); *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). "An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop." *Brigham*, 382 F.3d at 508. Hence, detention during these actions is reasonable under the Fourth Amendment. *Id.*

In an attempt to demonstrate that Baugh's detention of Collins extended longer than was necessary to effectuate the purpose of the stop, Collins argues that Baugh was required to terminate the traffic stop once he discovered that Collins was not Half-Dead and that there was a

---

[3]Baugh testified that, despite the fact that Collins was driving a rental car, the tinting of which he was not responsible for, it is within an officer's discretion to issue a citation in such a situation. Furthermore, Baugh did in fact issue Collins' a citation for improper display of the license tag, which he gave to the narcotics detective who took custody of Collins.

license tag displayed on the vehicle. Def. Motion to Suppress at 5-9 (citing numerous cases in which the court concluded that the officer's continued detention of the individual was not permitted once the initial justification for the stop had been dispelled). However, Collins is mistaken in his characterization of Baugh's basis for stopping Collins. Baugh testified that he pulled Collins over for the *improper display* of his license tag, not merely for the lack thereof. Therefore, Baugh's determination that there was in fact a license tag on the vehicle did not terminate the basis for the initial stop, because the tag was not visible as required by law. Rather, even having discovered the tag, Baugh's initial justification for the stop remained intact because the license tag was improperly displayed.[4]

Therefore, pursuant to the valid traffic stop, Baugh was well within his rights to initiate the check of Collin's driver's license, his criminal history, and to verify the rental car's return date and that Collins was an authorized driver of the car. *See Brigham*, 382 F.3d at 508; *Linkous*, 285 F.3d at 719; *Dortch*, 199 F.3d at 198; *Shabazz*, 993 at 437. Furthermore, Baugh was permitted to question Collins about where he was coming from and where he was going. In fact, any questioning, even on a subject wholly unrelated to the initial justification for the stop, that occurred during the pendency of the computer check of Collins' license and criminal history did not violate the Fourth Amendment. *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993).

The Fifth Circuit has routinely held that ". . . mere police questioning does not constitute

---

[4]Therefore, Collins' reliance on *United States v. Valdez*, 267 F.3d 395 (5th Cir. 2001) is misplaced. In *Valdez*, the officer initiated the traffic stop based on an expired inspection sticker and improper window tinting. 267 F.3d at 398. However, the officer continued to detain Valdez even after he determined that the sticker was not expired and that the tinting was not illegal. *Id.* at 398. The Fifth Circuit held that this was unconstitutional because the initial justification for the stop had dissipated. *Id.* The court also held that the officer was not entitled to detain Valdez while he ran a computer check because there was no evidence of a traffic violation. *Id.*

a seizure." *Shabazz*, 993 F.2d at 436. "Further, when questioning takes place while officers are waiting for the results of a computer check--and therefore does not extend the *duration* of the stop--the questioning does not violate Terry." *United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994)(emphasis in original) (citing *Shabazz*, 993 F.2d 431, 436-437 (5th Cir. 1993)). Baugh testified that he had not finished examining Collins' criminal history the last time Collins exited his vehicle, at which point officer safety became a concern and Baugh felt the need to question Collins regarding the presence of drugs or guns. Furthermore, Baugh stated that he did not finish reviewing the criminal history check until after Collins had been arrested. Thus, because Baugh had not completed his computer check at the time he questioned Collins regarding the presence of guns or narcotics and received consent to search, "'. . . the detention up to that point continued to be supported by the facts that justified its initiation.'" *Brigham*, 382 F.2d at 509 (quoting *Shabazz*, 993 F.2d at 437).[5]

The undersigned also finds that the detention and questioning were further justified by Baugh's reasonable suspicion that Collins was engaged in some sort of illegal activity. Baugh testified that his suspicions were aroused by (1) Collins' nervous, agitated behavior; (2) his abrupt shift from not wanting a ticket to urging Baugh to give him a ticket and let him go; (3) his inconsistent answers about where he was coming from and going; (4) his repeated exiting of his vehicle despite the officers' commands not to do so; and (5) Baugh's personal knowledge of Collins' past criminal conduct involving narcotics. These factors were sufficient to warrant Baugh's suspicion, based on his experience as a law enforcement officer, of illegal activity on the

---

[5]Although Baugh received the criminal history check results prior to obtaining consent to search Collins' person and vehicle, the check is meaningless without the officer's examination of it. Furthermore, it was Collins' erratic behavior that prevented Baugh from completing his review of the criminal history check.

8

part of Collins and, therefore, his subsequent questioning regarding the presence of guns and drugs and request for consent to search. *See Brigham*, 382 F.3d at 509 (finding that an officer's questions regarding the purpose and itinerary of the passengers' trip and, eventually, whether there was any illegal contraband or drugs in the vehicle was justified not only by the fact that the computer check was still pending, but also by the following: (1) the driver was not the owner of the car; (2) the lessee was not present in the car; (3) conflicting versions of the itinerary; (4) the driver's nervousness, his avoidance of eye contact, and his pattern of answering the officer's questions with questions of his own.); *See also, Crain*, 33 F.3d at 485 (finding that the passengers' conflicting stories and nervous behavior further justified detention during the pendency of the computer check); *United States v. Aleman*, 2006 WL 91777, *3 (E.D.La. Jan.13, 2006) (finding that continued detention was justified based on, among other things, inconsistent responses to officer's questions and nervousness).

"The Supreme Court has emphasized the importance of allowing officers to 'draw on their own experience and specialized training' to make . . . inferences from the facts available to them." *Brigham*, 382 F.3d at 509; *See also*, *United States v. Sanchez-Pena*, 336 F.3d 431, 437-438 (5th Cir. 2003); *United States v. Nelson*, 284 F.3d 472, 482 (3rd Cir. 2002) (noting the "great deference" afforded to an officer's experience and suggesting that under *United States v. Arvizu*, 534 U.S. 266 (2002), law enforcement experience and training become "the focal point of the [Fourth Amendment reasonableness] analysis.") Baugh testified that, through his work on the Monroe Police Department's SNAP Team, he has been involved in hundreds of traffic stops involving the discovery of narcotics and that in his experience actions such as those displayed by Collins are indicative of deceptive behavior. Baugh had a right to rely on this experience in concluding that such actions indicated that Collins was likely engaged in some type of illegal

9

activity. *Brigham*, 382 F.3d at 509. Therefore, given the brief duration of the stop,[6] this Court cannot say that Baugh's actions were anything but reasonable. The questioning simply ". . . exemplified a graduated response to emerging facts." *Brigham*, 882 F.3d at 500.

Having established that Baugh's initial stop and subsequent detention of Collins were reasonable, the only issue that remains to be addressed is the validity of the consent to search. "'To be valid, consent to search must be free and voluntary.'" *Shabazz*, 993 F.2d at 438 (quoting *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993). The government typically has the burden of proving voluntary consent by a preponderance of the evidence. *Shabazz*, 993 F.2d at 438 (citing *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir.1991). However, ". . . the government's burden to prove consent by [a] preponderance of the evidence is not as heavy as it would have been had a Fourth Amendment violation preceded the consent." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006) (citing *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir. 1999)).

"The voluntariness of consent is a question of fact to be determined on the totality of the circumstances." *Id.* In order to make this determination, courts look to the following factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police tactics; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education level and intelligence; and (6) his belief that no incriminating evidence will be found. *Id.* Although all six factors are relevant, no single factor is dispositive. *Id.* In this case, the first factor weighs against the government since

---

[6]Officer Baugh testified that the total elapsed time from the initial stop until the defendant gave consent to the search was no longer than 10 minutes.

it is not likely that Collins felt that he was free to leave at any point during the stop.[7]

As to the second factor, there is no evidence of any improperly coercive tactics on the part of Baugh. In fact, Baugh went out of his way to make sure that Collins was sure of his decision to allow Baugh to search. Although there is no indication that Baugh specifically informed Collins of his right to refuse consent, Baugh did testify that, prior to searching Collins' person or vehicle, he asked him numerous times for permission to search, and he even asked Collins if he were sure about the consent and whether he had any questions. Consequently, the evidence supports an inference that Collins was aware of his right not to consent, and that no unduly coercive tactics were used.

Regarding Collins' level of cooperativeness during the stop, the evidence is mixed. On one hand, Collins repeatedly exited his vehicle despite the officers' commands not to do so; however, he was very cooperative in the sense that he pulled over immediately when the stop was initiated, supplied his license and rental papers, answered Baugh's questions, and repeatedly granted Baugh consent to search himself and the vehicle.

Finally, no evidence was presented by either side regarding Collins' educational level and intelligence or whether he believed that any incriminating evidence would be found; therefore, these factors weigh in favor of neither party.

Collins argues that his consent was not voluntary because Baugh did not get him to sign a written consent form. However, Collins cites to no authority supporting the notion that consent

---

[7]This is bolstered by the fact that Baugh placed Collins in handcuffs once he discovered the bulge in Collins' waistband. Although Baugh told Collins that he was not under arrest, he was certainly in custody given that ". . . the circumstances were such that a reasonable person in his position would understand that he was not free to move about, much less leave the premises." *United States v. Davis*, 1995 WL 672409, *1 (E.D. La. Nov. 8, 1995).

11

to search must be in writing, nor is this Court aware of any such authority. Therefore, having considered the above factors, the undersigned concludes that Collins' consent was voluntary.[8]

Because Officer Baugh's initial stop and continued detention of Collins were reasonable under *Terry v. Ohio* and its progeny, and because his consent to search was voluntary, Collins' motion to suppress all evidence seized from him and his vehicle should be **DENIED**.

Collins next contends that all evidence seized after the traffic stop should be suppressed because the search warrants for 2829 West Deborah Drive and #50-D Colonial Drive were not based on probable cause. In support of this contention, Collins claims that, because the affidavits supporting the warrants were "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," the Government cannot rely upon the good faith exception to the warrant requirement. Motion to Suppress at 11 (citing *United States v. Fields*, 182 F.Supp. 575 (E.D. Tex. 2002); *United States v. Davis*, 226 F.3d 346, 352 (5th Cir. 2000)).

"This Court conducts a two-step analysis when assessing a motion to suppress evidence secured pursuant to a search warrant." *United States v. Marshall*, 182 F.Supp.2d 575, 578 (E.D. Tex. 2002) (citing *United States v. Cisneros*, 112 F.3d 1271, 1278 (5th Cir. 1997)). "First, the Court must determine whether the good faith exception to the exclusionary rule applies." *Id.* "If the good faith exception does apply, the motion to suppress should be denied." *Id.* "Only if the

---

[8]Although Collins' consent is sufficient to support the search of him and his vehicle, given the finding that the search of Collins' person was valid, the search of the vehicle was also valid because it occurred after Collins' arrest. Incident to a lawful arrest, an officer may search the area within the immediate control of the arrestee, including the passenger compartment of a vehicle in which the arrestee was a recent occupant. *New York v. Belton*, 453 U.S. 454, 460 (5th Cir. 1981) (relying on *Chimel v. California*, 395 U.S. 752 (1969). In this case, this drugs were found in the sunglasses compartment in the middle rooftop of Collins' car, which was in the area within the immediate control of Collins. *Id.* (finding that a jacket found in the passenger compartment of the car was within the scope of a search incident to an arrest).

12

good faith exception does not apply must the Court then "ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

In *United States v. Leon*, ". . . the Supreme Court established that 'evidence obtained by officers in objectively reasonable reliance upon a search warrant is admissible, even though the affidavit on which the warrant was based was insufficient to establish probable cause.'" *Marshall*, 182 F.Supp.2d at 578 (quoting *Leon*, 468 U.S. 897, 922-23 (1984). However, "[a]n officer's reliance on [a] warrant is not objectively reasonable and, therefore, not entitled to the good faith exception to the exclusionary rule if . . . [the] officer relies on a warrant based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable . . . .'" *United States v. Rojas Alvarez*, 451 F.3d 320, 330 (5th Cir. 2006) (quoting *United States v. Cherna*, 184 F.3d 430, 407-08 (5th Cir. 1999)). Collins argues that, because the warrants did not establish a nexus between the houses to be searched and the evidence sought, the warrants were so lacking in indicia of probable cause that the executing officers were not objectively reasonable in relying on them and, therefore, that the good faith exception does not apply in this instance. According to Collins, the supporting affidavits to the warrants contain no evidence indicating that drugs would be located in the Mr. Collins' residences.

Regarding this issue, the undersigned finds that *United States v. Nguyen*, 172 Fed.Appx. 558, (5th Cir. 2006), is instructive. In *Nguyen*, Drug Enforcement Agency investigators received information that Jeff Sibley ("Sibley") was distributing large amounts of methamphetamine, cocaine, and marijuana. *Id.* at 559. While conducting surveillance on Sibley's apartment, the investigators witnessed Nguyen visiting the apartment. *Id.* After Nguyen left, the investigators executed a search warrant at the apartment and subsequently found narcotics located therein. *Id.*

13

Sibley later told the investigators that he had purchased methamphetamine from Nguyen. Upon receiving this information, the investigators executed a search warrant at Nguyen's home, which resulted in finding of guns and cocaine. *Id.* at 559-60.

In an attempt to suppress this evidence, Nguyen argued that the good faith exception to the exclusionary rule did not apply because the affidavit supporting the warrant was ". . . so lacking in indicia of probable cause that belief in the existence of probable cause was entirely unreasonable." *Id.* at 561. In assessing this argument, the Fifth Circuit stated that "[in considering whether the affidavit had sufficient indicia of probable cause to search Nguyen's house, we must determine if the affidavit 'establish[ed] a nexus between the house to be searched and the evidence sought.'" *Id.* (citing *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996). The court further stated that "[t]he nexus may be established 'by direct observation or through normal inferences as to where the articles sought would be located.'" *Id.*

In concluding that Nguyen's claim was unavailing, the court stated the following:

> The affidavit in this case contains specific assertions . . . that (1) surveillance established that Nguyen had been in Sibley's apartment on . . . the day that a large amount of methamphetamine was found there, (2) Sibley said that Nguyen sold him two to three pounds of methamphetamine a week for four months at $11,000 per pound, (3) Sibley identified Nguyen as the man who sold him the drugs, (4) Nguyen was involved in distributing large amount of methamphetamine in exchange for large amounts of cash, and (5)Nguyen's car was observed at his residence on . . . [the day after the drugs were discovered at Sibley's apartment] . . ., and Nguyen was the owner of the residence. In addition, the warrant included statements that drugs dealers often keep contraband in their residences.

*Id.* at 561. Accordingly, the court concluded that ". . . the affidavit, [which supported a warrant seeking permission to search for and seize items associated with the distribution of methamphetamine], established a nexus between the residence and the illegal activity through normal inferences as to where the articles sought would be located" and therefore that the good

14

faith exception applied. *Id.*

In the case at bar, the warrants for Collins' West Deborah and 50-Colonial Drive residences were supported by affidavits stating that numerous confidential sources had implicated Collins in distributing cocaine and that the affiant had conducted two controlled buys in which Collins sold crack cocaine to a cooperating witness. The affidavit further stated that, following the second controlled buy, a traffic stop was conducted on Collins' vehicle, in which currency corresponding exactly to the denominations involved in the controlled buys was found. Then, after detailing the events of the January 11, 2006, traffic stop, which this Court has already concluded was valid, the affiant stated that an informant placed Collins at his Deborah Drive residence two hours prior to the traffic stop conducted after the second controlled buy and that Collins had given the 50-D Colonial Drive address as his residence while in custody. Finally, the affiant stated that, in his experience, drug dealers commonly maintain at their residences items such as drug manufacturing equipment, records showing monies derived from drug sales, records showing who drugs have been sold to or bought from, and guns.

Considering the similarities of the above affidavits to the one deemed to be within the good faith exception in *Nguyen*, the undersigned concludes that the officers who executed the search warrants at Collins' West Deborah Drive and 50-Colonial Drive residences acted reasonably in relying on the warrants. As in *Nguyen*, there was nothing in the affidavits that specifically placed drugs or drug-related paraphernalia at the residences searched; however, the affidavits ". . . established a nexus between the residence and the illegal activity through normal inferences as to where the articles sought would be located." *Nguyen*, 172 F.Appx. at 561 (quoting *Pace*, 955 F.2d 270, 277 (5th Cir. 1992)); *See also*, *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982) (explaining that continuing illegal activity strengthens the inference that

15

the articles sought will be located in the participant's house). Therefore, the good faith exception applies to the motion to suppress evidence seized from Collins' West Deborah Drive and 50-Colonial Drive residences. Furthermore, since Collins' claim that the remaining four warrants were insufficient is based on the warrants' reliance on the evidence seized during the stop and at the first two locations, the undersigned finds that the good faith exception also applies to these warrants. Thus, Collins' motion to suppress the evidence seized pursuant to the search warrants should be **DENIED**.

In his final argument, Collins moves to suppress all statements made by him in response to police questioning after he invoked his right to counsel at the Metro Narcotics Unit on January 11, 2006. Detective David May of the Monroe Police Department testified that he contacted Collins while he was in custody and, apparently, after Collins had invoked his right to counsel. Accordingly, Collins argues that all statements made in response to police interrogation after the assertion of his right to counsel, and all derivative evidence from those statements, be suppressed. However, as the government notes, Detective May's contact with Collins' was limited to obtaining the alarm codes to his two homes so that the police would be able to turn the alarms off when they entered the houses. Therefore, May's motivation in getting the codes was to avoid damaging Collins' home or alarm box. Moreover, the search warrants for the two homes had already been obtained prior to May's contact with Collins; therefore, the search would have occurred even if Collins had not given May the alarm codes, and there was no evidence obtained as result of the contact. Accordingly, Collins' motion to suppress on this ground should be **DENIED**.

## CONCLUSION

For the reasons stated above, it is recommended that defendant's Motion to Suppress be

16

**DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 6th day of October, 2006.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE